**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Anthony C. SARNO and Charles W. Knapp, Defendants–Appellants.
(Two Cases).**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph V. NASH, Defendant–Appellant.**

Nos. 93–50859, 93–50860, 94–50010, 95–50270 and 50271.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 5, 1995.*

Sept. 22, 1995.**

Filed Dec. 11, 1995.

---

\* The panel finds this case appropriate for submission without oral argument pursuant to 9th Cir.R. 34–4 and Fed.R.App.P. 34(a).

\*\* The panel finds these cases appropriate for submission without oral argument pursuant to 9th Cir.R. 34–4 and Fed.R.App.P. 34(a).

rant & Miller, San Francisco, California (argued); Joseph V. Nash, pro se, North Las Vegas, Nevada (on the briefs), for defendants-appellants.

Carolyn J. Kubota and David Schindler, Assistant United States Attorneys, Los Angeles, California, for plaintiff-appellee.

Before McKAY,[***] REINHARDT, and FERNANDEZ, Circuit Judges.

## OPINION

McKAY, Circuit Judge:

These appeals recount a sadly familiar tale from the Eighties: the financial looting of a federally-insured lending institution by would-be robber barons.[1] The following facts are those which the jury reasonably could have found.

The architect of this particular scheme, Defendant Charles W. Knapp, controlled a suite of financial service corporations collectively identified as the "Trafalgar entities." In the spring of 1988, Mr. Knapp was gathering capital to fund a foray into the insurance business. Defendant Anthony Sarno, who headed a financial consulting firm, was retained by Mr. Knapp to "build a balance sheet" that would enable Mr. Knapp to enter the reinsurance industry. Mr. Sarno planned to obtain assets for the various Trafalgar corporations through a series of stock swaps with other small businesses: After exchanging its preferred stock with the preferred stock of an outside corporation, a Trafalgar entity would note an increase in shareholders' equity equal to the value of the transferred stock and then record the acquisition of an asset equal to the value of the received stock. Among those companies solicited by Mr. Sarno were three companies partially owned by Defendant Joseph Nash, a

Donald M. Re, Los Angeles, California (argued); John J. Bartko, Bartko, Zankel, Tar-

[***] The Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit, sitting by designation.

1. This opinion consolidates and disposes of five cases now pending: Mr. Knapp's appeal of his conviction and sentence, No. 93–50860; Mr. Knapp's appeal of the district court's denial of his motion for a new trial, No. 95–50271; Mr. Sarno's appeal of his conviction and sentence, No. 93–50859; Mr. Sarno's appeal of the district court's denial of his motion for a new trial, No. 95–50270; and Mr. Nash's appeal of his conviction and sentence, No. 94–50010.

CPA and long-time associate of Mr. Sarno who used his influence on behalf of his friend. Mr. Nash's advocacy proved unavailing, however, and the three corporations—Paperulers, Inc., Star–Glo Industries, and Detroit Body Products—rejected Mr. Sarno's overtures.

Mr. Sarno's other efforts likewise failed to meet with great success, and in June 1988, Mr. Knapp, whose companies were plagued with cash flow difficulties, sought out alternative sources of funds. Mr. Knapp found Mr. Gary Driggs, at that time the President of Western Savings and Loan and presently an unindicted co-conspirator of the Defendants. Mr. Knapp was desperate to borrow money; Mr. Driggs, in turn, was desperate to lend it.[2] Western agreed to loan Trafalgar Capital $15 million if Trafalgar Capital could submit a financial statement showing a net worth of $45 million. The loan was to close on June 30, and an audited financial statement was due by August 1. Messrs. Knapp and Sarno redoubled their efforts to build an appropriate balance sheet for Trafalgar Capital.

On June 22, 1988, Mr. Knapp submitted to Western a draft financial package based upon a "pro forma" Trafalgar Capital financial statement. This pro forma statement assumed that stock swaps worth $108 million would close by June 30. These assumptions notwithstanding, in the last week of June Mr. Sarno informed Mr. Knapp that the stock swap method would not suffice to create the net worth desired for Trafalgar Capital. Undaunted, Mr. Knapp quickly discovered a transaction that would generate the paper assets needed to put Trafalgar over the top. Mr. Knapp turned to Mr. Bill Morgan, a business associate who occasionally worked as real estate broker in Texas. Mr. Morgan brokered a deal between Trafalgar Interests of Texas ("TIOT"), a Knapp entity that was not (in form at least) a subsidiary of Trafalgar Capital, and the owners of the Circle C

Ranch, a financially troubled residential development near Austin, Texas.

On June 28, the Circle C owners agreed to sell TIOT a one-half interest in the Circle C for $31.5 million. Mr. Knapp tendered a check for $1 million, with $30.5 million in promissory notes to follow. On June 29, TIOT transferred its interest in the Circle C to a subsidiary of Trafalgar Capital for $71 million—$1 million in cash (which would be used to fund the check given to the owners of the Circle C) and $70 million in Trafalgar Capital preferred stock. Trafalgar Capital did not assume the $30.5 million debt incurred by TIOT in purchasing the Circle C. The net result of this non-arms-length transaction was therefore the acquisition by Trafalgar Capital of a (supposed) $71 million asset in exchange for a $70 million increase in shareholder equity.

On June 28, 1988, Messrs. Sarno and Knapp prepared and submitted a second "pro forma" financial package to Western. Like its predecessor, this package also assumed that the deals described therein would close by June 30. The information given Western indicated that Trafalgar Capital's net worth far exceeded $45 million. Anticipating the events of the next day and undeterred by the purchase price paid by TIOT on the morning of June 28, Trafalgar Capital's financial statement listed the Circle C as a $71 million asset unencumbered by any debt. The financial package, relying upon papers of intent signed that same day by Joseph Nash, also assumed that Paperulers, Star–Glo, and Detroit Body would swap with Trafalgar Capital an amount of stock whose value substantially exceeded the net worth of each of those companies—notwithstanding the earlier refusal by those companies to do that very thing. While generally labelling its representations vis-a-vis the Circle C and the stock swap as "assumptions," the financial package warranted that the impact of all transactions (hypothetical and otherwise) had

---

**2.** Western was under pressure from the federal authorities to improve its balance sheet. Mr. Driggs was therefore searching for someone who would, with the proper incentive, purchase certain bad debts from Western. Mr. Knapp fit the bill nicely. One of the Trafalgar companies—which, on paper, looked like a sound credit risk—borrowed $15 million from Western; a substantial percentage of this money was then transferred to another Trafalgar corporation and used to purchase foreclosed properties from Western. The scheme worked until Trafalgar forfeited on the loan.

been calculated in accordance with "generally accepted accounting principles" ("GAAP").

On June 30, 1988, Mr. Brian O'Boyle, a Western loan officer, met with Mr. Sarno and representatives of Trafalgar Capital to finalize the loan agreement. At this meeting, Mr. Sarno disclosed to Mr. O'Boyle the elements of the Circle C deal, and assured him that the $40 million "step-up" in the value of the Circle C comported with GAAP. The loan for $15 million closed at the end of the meeting. Trafalgar received $13 million by July 6;[3] the remaining $2 million was withheld pending an audit of Trafalgar Capital.

Messrs. Knapp and Sarno looked to Mr. Nash (a CPA and the head of his own accounting firm) to perform the required audit. On Mr. Nash's advice, the Circle C "step-up" was retroactively re-created to bring the deal into better alignment with GAAP. The Defendants backdated documents that purported to excise TIOT from the deal and, in its place, to substitute Nepenthe, Inc., a shell corporation owned by Mr. Morgan. Nepenthe then retroactively sold the property to Trafalgar Insurance for $71 million—$1 million in cash (which had, in fact, already been paid by Mr. Knapp) and $70 million in Trafalgar Capital preferred stock. As had TIOT, Nepenthe on paper retained the $30.5 million owed to the sellers of the Circle C, and Trafalgar Capital again bought a $71 million asset for a comparatively trivial payment. To further bolster Trafalgar Capital's financial statement, during July 1988, Messrs. Knapp, Sarno, and Nash fabricated a series of transactions to augment Trafalgar's otherwise meager income stream by roughly $1.8 million.

On July 28, 1988, Mr. Nash signed a standard opinion letter certifying the audit of Trafalgar Capital. Western funded the remaining $2 million shortly thereafter. Through the remainder of 1988 and the early months of 1989, the Defendants continued their efforts to cloak the events surrounding the Western loan with a semblance of propriety, albeit with little success. Trafalgar defaulted on its loan later in 1989.

On March 3, 1993, the Defendants were indicted for three counts of violating 18 U.S.C. § 1014 by submitting false statements to a federally insured lending institution for the purposes of inducing a loan. The charges arose from the submission of the June 22, 1988, financial package, the June 28, 1988 financial package, and the audited financial statement, respectively. The Defendants were also indicted for conspiracy to violate 18 U.S.C. § 1014. After a two-week jury trial, Messrs. Sarno and Knapp were found guilty of conspiracy and of two substantive violations of § 1014 (corresponding to the June 28 financial package and the audited financial statement). Mr. Nash was convicted of conspiracy and of one substantive violation of § 1014 (corresponding to the audited statement). The jury acquitted Mr. Knapp on the remaining count (the June 22 draft financial package), and was unable to reach a verdict with respect to Mr. Sarno on that count.

On appeal, each defendant makes numerous allegations of error. Each allegation is addressed in turn below. Arguments common to more than one defendant are, of course, grouped.

## I. Treatment of "Pro Forma" Financial Documents under § 1014

From the outset of this case, Messrs. Knapp and Sarno have assiduously argued that the term "false statement," as used within the meaning of § 1014, does not comprise—as a matter of fact or law—the class of allegedly hypothetical representations made by the June 28, 1988, "pro forma" financial package. The Defendants argue that the "pro forma" financial statement—which they equate to an explicitly hypothetical representation—is not an assertion of fact and, thus, cannot as a matter of law be either true or false. Hence, they conclude, the June 28 package could not have violated § 1014, which by its terms requires a "false statement." *Cf. Williams v. United States,* 458 U.S. 279, 284–85, 102 S.Ct. 3088, 3091–92, 73 L.Ed.2d 767 (1982) (holding that a bad

---

**3.** One million dollars of the initial loan installment was then used to pay the check given for the Circle C.

**1482**

check cannot qualify as a false statement under § 1014 because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.' ").

It must be admitted that the Defendants' reasoning is not totally devoid of legal merit. *Williams,* fairly read, indicates that a transactional document need not be a factual representation within the meaning of § 1014—even where, as in *Williams,* a document is commonly understood to imply the existence of certain factual conditions.[4] Beyond its resolution of the issue immediately before the Court, however, *Williams* gives little guidance to the task of defining, or even identifying, a "statement of fact." Few other cases even touch on the general aspects of the question advanced by the Defendants—when can an allegedly hypothetical statement be treated as a criminal misrepresentation of fact?—and apparently no case addresses this issue in detail. This circuit has, without any analysis of this issue, affirmed a § 1014 conviction based upon a pro forma financial statement submitted to a savings and loan institution. *See United States v. Smith,* 891 F.2d 703, 708 (9th Cir.1989).

We acknowledge that a hypothetical assertion clearly labeled as such cannot be held to the same standard of rectitude as a statement of pure historical fact. One who seeks to predict the future must be allowed some room for error. A bank that knowingly accepts a reasonable, good-faith, but ultimately erroneous, prognostication is guilty perhaps of poor business judgment, but is not the victim of a crime. We cannot, however, agree that, as a matter of law, affixing the label "pro forma" or "hypothetical" to a financial statement immunizes an individual from criminal prosecution. It would be absurd to allow an artful financier to circumvent the scope of § 1014 by employing such a simple subterfuge: an unscrupulous businessman could run wildly inflated "pro forma" figures by overly-credulous banks and S & Ls without any fear of criminal liability.[5] To attach such force to a label would eviscerate the statute, and we refuse to ascribe such an intent to Congress in the absence of evidence far more compelling than any presented by the Defendants here. Thus, some allegedly hypothetical representations must qualify as statements of fact within the meaning of § 1014.[6]

There is, as noted above, apparently no case that analyzes this precise question. Ranging farther afield, the most cogent analysis of a related question—the criminal liability under 18 U.S.C. § 1001 (the generic "false statement" statute) of accountants for the submission of an allegedly false audit opinion letter—comes from Judge Friendly in *United States v. Simon,* 425 F.2d 796, 805–06 (2d Cir.1969), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970). In *Simon,* the court announced a two-part test for falsehood that recognized the often-fuzzy character of fact (and truth). First, did the financial statement taken as a whole " 'fairly present[ ]' " the financial condition of the company and accurately report the relevant operations of the company? If not, were the inaccuracies presented in good faith? A negative answer to both questions would support a finding of criminal liability. *See* 425 F.2d at 805–06. This test generally accords with the "reasonableness" standard used in civil litigation to judge the truth of hypothetical financial statements. *See, e.g.,*

---

4. One who is paid with a check, for example, typically assumes that the drafter in fact has funds sufficient to cover the check.

5. Undoubtedly, a great many such applications would be rejected by the recipient financial institutions. There would, however, be nothing to deter a would-be robber baron from searching for more gullible prey.

6. Mr. Knapp alternatively advocates that we adopt as the test for liability under § 1014 a "reasonableness" standard that would turn upon the degree to which a "pro forma" statement comported with GAAP. This we refuse to do. Adherence to GAAP would obviously qualify as weighty exculpatory evidence; it does not, however, necessarily shield one from criminal liability. *See United States v. Weiner,* 578 F.2d 757, 785–86 (9th Cir.), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978); *cf. Simon,* 425 F.2d at 796–97 (rejecting an argument that adherence to GAAP precludes liability under § 1001). The record, in any event, demonstrates that the Defendants' practices were not in accord with GAAP. *See infra.* Any possible error in this respect would therefore be harmless.

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413–15 (9th Cir.1994) (collecting cases which hold that prospective or hypothetical financial statements can, if based upon unreasonable assumptions, be materially false so as to give rise to civil liability), *cert. denied,* —— U.S. ——, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995).

Were it necessary for us to explore the intricacies of the falsehoods conceivably attributable to hypothetical representations, we would be inclined to adopt Judge Friendly's test. A good-faith prediction, which fairly and accurately discloses both its underlying assumptions and the actual financial condition(s) of the relevant players, does not merit criminal sanction. We see no need to conduct such an in-depth inquiry, however, in light of our broader conclusion that the labeling of a financial submission as a hypothetical, a pro forma, or an assumption does not of itself forestall criminal liability. Notwithstanding the care with which the Defendants prepared the June 28 financial statement, the record contains ample evidence that the June 28 financial package makes certain factual assertions that could have been found false by a reasonable jury.

■ As noted above, the approval of the loan hinged upon the submission of balance sheet that indicated a net worth for Trafalgar of $45 million. Thus, the balance sheet, with its accompanying assumptions, constituted the heart of the June 28 package. The balance sheet itself was plainly labeled as a "PROFORMA [sic]"; the assumptions were likewise plainly identified as such. The third assumption contains virtually all of the material financial information and is the only one which merits consideration here:

> The proforma [sic] investment portfolio includes the following investments which have closed as of June 28, 1988:

| | | |
|---|---|---:|
| (a) | Paperulers, Inc. | $ 3,000,000 |
| (b) | Geothermal Development Corp. | 5,000,000 |
| (c) | Star–Glo. Corporation | 2,000,000 |
| (d) | Detroit Body Products | 2,000,000 |
| (e) | Old American Capital | 4,000,000 |
| (f) | Circle C Ranch | 71,000,000 |
| (g) | Stephen Moses Interests Mortgage Receivable | 12,000,000 |
| (h) | Tennessee Resources, Ltd. | 15,000,000 |
| | Gross Value | 114,000,000 |
| | Reserves | (32,000,000) |
| | | $82,000,000 |

Sarno Appendix (Case No. 93–50859) Vol. II, Tab M, at 10. When read in the light of the other evidence in the record, we conclude that this so-called assumption contains sufficient factual misrepresentations to support the jury's verdict.

It must be noted, first of all, that the clause "which have closed as of June 28, 1988" need not be taken as a hypothetical statement at all. The Defendants could easily have stated (as an assumption), "The investments included in this investment portfolio have closed as of June 28." They did not do so. As written, a perfectly sensible (and, indeed, the preferred grammatical) reading could interpret the rather strained syntax to mean that the investments have in fact closed but their inclusion in the portfolio or the values attributed to them remain hypothetical.

The conviction need not rest on grammar, however. The record contains abundant evidence that the shareholders of Paperulers, Star–Glo, and Detroit Body Products had in fact rejected the proposed stock swaps prior to June 28, 1988. Credible representatives of each of these companies so testified at trial. This rejection was known as a matter of fact both to Mr. Nash (who was a sizable stockholder in each company) and to Mr. Sarno (who made the initial overtures to the three companies). It is one thing to make an assumption (even an unreasonable assumption) in the absence of knowledge; it is quite another to put forth as assumptions those conditions that are known to be contrary to

fact. It seems quite obvious that the latter type of "assumption" falsely represents as possible ("the deal may go through") that which is known to be false ("the .deal has been rejected and cannot occur"). Those portions of the third assumption pertaining to Paperulers, Star-Glo, and Detroit Body Products therefore qualify as "false statements" within the meaning of § 1014.

Second, and of greater significance, the first page of the June 28 financial package contains the following language: "[T]he Company will warrant that. its consolidated net worth as calculated under generally accepted accounting practices will not be less than three times total debt outstanding." Gov't Nash Appendix Vol. I, at 113. This language necessarily informs the so-called assumptions that follow by defining as the permissible domain of possible assumptions those statements (hypothetical or not) which accord with GAAP. To then proffer an assumption that falls outside the bounds set by GAAP is itself a false representation of the nature of the assumption that would necessarily mislead and deceive the unwary recipient.

Thus, to focus upon the most significant of assumptions contained in the June 28 package, the value ascribed to the Circle C must have some mooring in GAAP irrespective of the substantive merit of the number itself. The record, however, is replete with evidence that the Circle C transaction did not adhere to GAAP and that the Defendants knew that such was the case. A number of witnesses testified that GAAP require a buyer to record the value of an asset at no more than purchase price; Defendant Sarno admits as much in his reply brief, see Sarno Reply Br. at 18. The Defendants attempted to circumvent this constraint by first passing the Circle C through a corporation controlled by Mr. Knapp—thereby setting up an intermediate purchaser from whom Trafalgar Capital could "buy" an extraordinarily over-priced asset with stock of dubious pedigree. This elevation of form over substance, however,

itself fails to meet the standards of GAAP. Mr. Schumann, a CPA who worked with Messrs. Sarno and Knapp on the preparation of the June 28 submission, so testified (under a grant of immunity). Moreover, the evidence adduced at trial easily supports the conclusion that the defendants themselves realized that the artifice underlying the June 28 submission was insufficient: how else to explain the rather elaborate measures taken in July to insert Nepenthe retroactively into the Circle C deal in lieu of TIOT? Mr. Morgan, the owner of Nepenthe, testified that Mr. Sarno had told him that the substitution of an independent corporation for TIOT was necessary to placate the accountants. In short, having warranted that their "assumptions" were in accord with GAAP, the Defendants were by bound by this self-imposed limit upon their financial creativity. A rational jury could easily find from this record that the Defendants failed to abide by GAAP. The statement that the assumptions comported with GAAP was therefore false. Hence, the claim that no false statement was made by the June 28 prospectus is without merit.

## II. Propriety of the Jury Instructions

### A. Refusal to Instruct the Jury on the Legal Meaning and Impact of the Term "Pro Forma"

The Defendants submitted a number of proposed jury instructions that sought to define the nature of a "pro forma" financial statement vis-a-vis a "false statement" charge.[7] The district court rejected each of the proposed definitions, reasoning that the instructions offered by the Defendants were both "unnecessary" and "argumentative": "This court believed that the evidence and arguments could more than adequately allow the jury to understand the factual and legal issues associated with the alleged falsity of the pro-forma financial statements." Knapp Appendix Vol. II, Tab J, at 4.

---

7. It is worthy of note that the Defendants' proposed instructions run quite close to the edge of what constitutes a "theory of the case" or "theory of the defense" instruction—a doctrine that generally involves the assertion of a legal, as

opposed to a factual, defense to the charge. See *Escobar de Bright*, 742 F.2d at 1198 (indicating that "theory of the case" doctrine allows defendant to request instruction on *legal* theories of defense).

It is settled law that "'[a] defendant is entitled to have the judge instruct the jury on his theory of the case, provided that it is supported by law and has some foundation in the evidence.'" *United States v. Dees*, 34 F.3d 838, 842 (9th Cir.1994) (quoting *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir.1990)); *United States v. Zuniga*, 6 F.3d 569, 570 (9th Cir.1993). A failure to instruct a jury upon a legally and factually cognizable defense is not subject to harmless error analysis. *United States v. Morton*, 999 F.2d 435, 437 (9th Cir.1993); *United States v. Escobar de Bright*, 742 F.2d 1196, 1201–02 (9th Cir.1984). We may nonetheless affirm the refusal to give an otherwise proper "theory of the defense" instruction if the instructions actually given, taken as a whole, adequately encompass the defendant's theory. *See Dees*, 34 F.3d at 842. We review *de novo* the legal adequacy of the instructions actually given by the district court. *See United States v. Duran*, 59 F.3d 938, 940–41 (9th Cir.1995); *United States v. Taren–Palma*, 997 F.2d 525, 530 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1648, 128 L.Ed.2d 368 (1994). However, the language of the instructions given by the district court need not conform to the formulation proposed by the defendant so long as it "fairly and adequately embod[ies] the relevant law regarding the issues presented." *United States v. Marsh*, 26 F.3d 1496, 1502 (9th Cir.1994). We therefore review for an abuse of discretion the form in which the district court has expressed the defendant's theory of the case. *See United States v. Joetzki*, 952 F.2d 1090, 1095 (9th Cir.1991); *United States v. Kessi*, 868 F.2d 1097, 1101 (9th Cir.1989). We likewise evaluate the district court's determination of the factual basis for a requested instruction under an abuse of discretion standard.[8]

We agree with the district court that the requested instructions were either unduly argumentative or unnecessary because they were adequately subsumed by the instructions given to the jury. "[A] court is not required to accept a proposed instruction which is manifestly intended to influence the jury towards accepting the evidence of the defendant as against that of the prosecution." *United States v. Hall*, 552 F.2d 273, 275 (9th Cir.1977); *see also United States v. Felix–Gutierrez*, 940 F.2d 1200, 1211 (9th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 2332, 124 L.Ed.2d 244 (1993). The first contested instruction—the definition of "projection" requested by Messrs. Sarno and Knapp—would have done just that.[9] In suggesting that the June 28 package would "not ordinarily" be considered a factual assertion, the proposed instruction would itself have unduly advanced the Defendants' interpretation of the evidence. A defendant may not draw upon the right to present a "theory of the case" to compel a certain resolution to a disputed question of fact. In any event, we concur with the district court's conclusion that no precise definition of "projection"—a word that is not a legal term of art—was necessary given the extensive treatment accorded the issue by both sides at trial.

The other requested instructions favor the Defendants more strongly still. The second instruction advanced by Mr. Sarno declares that "the assumptions to a *pro forma* statement are not themselves statement [sic] of fact which can form the basis of a false statement within the meaning of the offenses charged." Sarno Appendix, (Case No. 93–50859) Vol. II, Tab L, at 2. We have already rejected the proposition that a pro forma label is dispositive of the issue of

---

8. This circuit has previously recognized the existence of an intra-circuit split upon the proper standard by which to review "theory of defense" decisions. *See United States v. Zuniga*, 6 F.3d 569, 570 (9th Cir.1993) (recognizing that both the abuse of discretion standard and the *de novo* standard have been used in this context); *United States v. Frank*, 956 F.2d 872, 879 (9th Cir.1991) (same), *cert. denied*, 506 U.S. 932, 113 S.Ct. 363, 121 L.Ed.2d 276 (1992). This conflict now appears to have been resolved. *See Duran*, 59 F.3d at 940–41.

9. A projection as to a future event is not ordinarily a statement of fact. A projection is simply a forecast or a prediction that a particular event or condition is likely to happen or be true in the future, and no one can reliably predict the future. Such a forecast cannot be false as long as there is a reasonable basis to believe that it may occur.
Knapp Appendix Vol. I, Tab 141, at 3; Sarno Appendix (Case No. 93–50859) Vol. II, Tab L, at 3.

criminal liability under § 1014. We have, furthermore, indicated that a rational jury could have found that the June 28 financial package made factual assertions. Mr. Sarno's proposed instruction, in contrast, would have (wrongly) precluded such a finding as a matter of law and would, in effect, have granted him judgment as a matter of law. The district court did not err in refusing to give such a legally mistaken instruction.

■ Mr. Knapp's second requested instruction, which would have compelled an acquittal had the jury found that the financial documents were prepared in accordance with GAAP, likewise misstates the applicable law.[10] Conformity with GAAP, while persuasive evidence of a lack of falsehood, does not settle the issue. *See United States v. Weiner,* 578 F.2d 757, 785–86 (9th Cir.) (analyzing "false statement" convictions under various securities laws), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978); *see also United States v. Simon,* 425 F.2d 796, 805 (2d Cir.1969), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970). While it might have been preferable for the district court to have instructed the jury that conformity with GAAP was evidence favorable to the Defendants, the form of jury instructions is left to the discretion of the district court. The district court did not abuse its discretion in refusing this requested instruction.

■ Irrespective of the propriety of the proposed instructions, the Defendants also argue that the district court should have given the jury some guidance upon the concept of "pro forma" financial statements. Some such instruction might well have been helpful. However, as noted above, the precise formulation of jury instructions lies within the discretion of the district court. *See United States v. Joetzki,* 952 F.2d 1090, 1095 (9th Cir.1991) ("Even imperfect jury instructions will not form the basis for reversing a conviction unless they constitute an abuse of discretion."); *Stoker v. United States,* 587 F.2d 438, 440 (9th Cir.1978) (stating that jury instructions must not mislead or be "inadequate to guide the jury's deliberations"). The district court, concluding that the extensive discussion at trial of the hypothetical character of a "pro forma" statement obviated the need to educate the jury through an instruction, gave instead a standard definition of a false statement: "A statement is a representation of fact. A statement or representation is 'false' if it was untrue when made and was then known to be untrue by the person making it or causing it to be made." Gov't Nash Appendix Vol. II, at 548. This somewhat terse language may well have been "imperfect"; however, our review of the trial transcript indicates that the Defendants ably took advantage of their many opportunities to argue the nuances of predictive accounting to the jury. We therefore conclude that the district court committed no error in rejecting the Defendants' proposed instructions.

■ The Defendants make much of the fact that the trial court declined to give the jury supplemental instruction on the "pro forma" concept despite the jury's request for such information. As the record makes plain, however, the request pertained only to the count arising from the *June 22* financial package; verdicts were reached on each of the other counts without difficulty. None of the defendants was convicted of crimes associated with the June 22 package. Any error was therefore harmless. *United States v. Marsh,* 26 F.3d 1496, 1502 (9th Cir.1994). Alternatively, the decision to issue additional instructions rests within the discretion of the district court. *United States v. Hayes,* 794 F.2d 1348, 1352 (9th Cir.1986), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). In light of the limited nature of the

---

**10.** The truth or falsity of representations made in a financial statement must be evaluated according to both the type of financial statement involved and the accounting rules that apply to that type of financial statement. This means that if the financial statement was a "pro forma" statement, in other words, an attempt to reflect the effects of a possible transaction which had not occurred, a particular representation is only false if the transaction was not summarized in accordance with generally accepted accounting principles and rules as to that transaction.... Thus, a representation made in a pro forma ... cannot be false if the accountant followed normal accounting or auditing principles and rules when he prepared the particular statement.
Knapp Appendix Vol. I, Tab 128, at 15.

additional requested instructions, the refusal at issue here did not abuse that discretion.

### B. Refusal to Instruct the Jury on the Meaning of the Term "Closed"

The Defendants submitted the following definition of the term "closed":

> There is no universal definition of the term "had closed." In this case, the phrase "had closed" is used to describe the completion of certain business transactions. A business transaction is considered "closed" when all necessary steps to make that transaction complete have taken place. The steps needed to make a transaction complete will depend on the transaction being considered and the understanding between the parties to the agreement.

Knapp Appendix Vol. I, Tab 141, at 4. The district court found the proposed instruction "unnecessary" and "confusing" and declined to give it. The court reasoned that "[t]he issue of whether the substance and status of the relevant financial transactions were honestly described *to Western* in connection with the loan application was a question of fact for the jury ... [that] did not hinge on any particular determination of whether the disputed transactions had formally 'closed'...." Knapp Appendix Vol. II, Tab J, at 5.

■ We agree that this instruction was both unnecessary and argumentative. The extent to which the stock swaps with Paperulers, Detroit Body Products, and Star–Glo had "closed" was vehemently contested by the parties. The Defendants consistently adhered to a narrow "technical" definition of "closed" that emphasized the fact that Joseph Nash had signed letters of intent to consummate the swaps. The Government in turn argued that, paper trails notwithstanding, the swaps were phantom transactions which faded away as soon as the loan from Western funded. We cannot say that either position was necessarily correct as a matter of law, and each found some support in the evidence presented at trial. The definition of "closed" suggested by the Defendants framed the question to their advantage. The district court preferred not to so skew the presentation of issues to the jury, and instead chose to allow the parties to stand on their arguments and evidence. This decision was not in error.

### C. Refusal to Instruct the Jury on the Defense of "Good Faith Reliance"

Mr. Knapp and Mr. Nash claim that the district court erroneously refused to instruct the jury on the defense of "good faith reliance." This argument is foreclosed by our precedents.

■ Notwithstanding the normal rules governing "theory of defense" requests, the Ninth Circuit has held that "the failure to give an instruction on a 'good faith' defense is not fatal so long as the court clearly instructed the jury as to the necessity of 'specific intent' as an element of a crime." *United States v. Solomon,* 825 F.2d 1292, 1297 (9th Cir.1987), *cert. denied,* 484 U.S. 1046, 108 S.Ct. 782, 98 L.Ed.2d 868 (1988); *see also United States v. Dorotich,* 900 F.2d 192, 193–94 (9th Cir.1990) (quoting and reaffirming *Solomon* ). Mr. Knapp does not dispute that the district court properly instructed the jury that a finding of specific intent was necessary to sustain a conviction under § 1014. Gov't Nash Appendix Vol. II, at 549. Mr. Knapp contends that *Solomon* and *Dorotich* are limited to cases of tax fraud. While it is true that *Solomon* and *Dorotich* arose in that context, the fundamental question prompted by the defense remains the same irrespective of the applicable statute: Does good faith reliance demonstrate a lack of specific intent to commit the actions punished by the statute? We see no reason to apply a different rule here and therefore affirm the district court's decision to give a "specific intent" instruction in lieu of that requested by Mr. Knapp.

■ Alternatively, the district court, while recognizing the very low evidentiary threshold that must be met by a "theory of defense" request, nonetheless found that Mr. Knapp had failed to clear that threshold. We review for abuse of discretion a district court's factual findings vis-a-vis a "theory of the case" instruction. *See United States v. Taren–Palma,* 997 F.2d 525, 530 (9th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1648, 128 L.Ed.2d 368 (1994). The quantum

of evidence sufficient to support a "theory of the case" instruction is slight indeed. *See United States v. Zuniga,* 6 F.3d 569, 570 (9th Cir.1993) (" 'some foundation in the evidence' "); *United States v. Morton,* 999 F.2d 435, 439 (9th Cir.1993) ("more than a scintilla"). This standard notwithstanding, the record suggests that the district court did not abuse its discretion. Mr. Knapp's protestations to the contrary, virtually no evidence was adduced at trial that suggests his "good faith reliance" on fully informed and independent advisors. The instruction was properly rejected.

 Mr. Nash also appeals the district court's decision not to instruct the jury on his proposed reliance defense.[11] While it must be admitted that good faith is generally raised by the client of a CPA or other professional who claims to have relied on the advice of a scoundrel, there is no analytic reason to treat the defense differently when it is raised by a CPA who claims to have relied upon GAAP and data provided by an unscrupulous client. In either instance, the Defendant attempts to refute intent by advancing good faith as a shield. The district court's decision to instruct the jury on specific intent therefore obviated the proposed reliance instruction.[12]

## III. Alleged Evidentiary Errors

 We review the district court's evidentiary rulings for abuse of discretion. If nonconstitutional error has been committed, we reverse unless it is "more probable than not that the erroneous admission did not affect the jury's verdict." *United States v. Hill,* 953 F.2d 452, 458 (9th Cir.1991).

## A. Exclusion of Evidence of Complicity on the Part of Bank Officials in the Approval of the Loan

The government acknowledges that Mr. Gary Driggs, the President of Western, conspired with Mr. Knapp to orchestrate the loan to Trafalgar Capital. Western was under pressure from federal officials to rid itself of certain bad debts. The record indicates that a substantial portion of the money loaned to Western was in fact used by a Knapp corporation to purchase properties from Western. Messrs. Knapp and Sarno assert that the evidence of Mr. Driggs's complicity tends to rebut the possibility that the June 28 statement and the audited statement had the capacity to influence the approval of the loan. Proof of capacity to influence, they correctly note, is an essential element of the Government's case under § 1014. *United States v. Hutchison,* 22 F.3d 846, 851 (9th Cir.1993). Therefore, they argue, exclusion of this evidence impermissibly constrained their ability to make "the strongest case they are able to marshal in their defense." *United States v. Thomas,* 32 F.3d 418, 421 (9th Cir.1994).

We have previously indicated that proof of a bank's reliance is not an element of § 1014 and, therefore that the complicity of bank officers is no defense to § 1014. *See United States v. Blumenthal,* 945 F.2d 280, 282–83 (9th Cir.1991); *United States v. Wilcox,* 919 F.2d 109, 110–12 (9th Cir.1990). Messrs. Knapp and Sarno, of course, do not argue that the complicity of Mr. Driggs absolves their actions of guilt. Rather, they contend that an inference of capacity to influence would normally follow from the approval of a

11. Mr. Nash's proposed instruction reads (in pertinent part) as follows:

Defendant Nash has introduced evidence that [ ] his accounting firm expressed an opinion in reliance on financial information provided by the client ... and that this opinion was rendered in compliance with professional accounting standards....

....

If, after consideration of all the evidence in the case, ... [you are] left with a reasonable doubt as to whether defendant Nash ... expressed an honestly-held opinion [in compliance with accepted professional standards], [you] must acquit....

Nash Appendix Vol. I, at 193–94 (third alteration in original).

12. Alternatively, the requested instruction, in requiring the jury to acquit if it found the audit to be in conformity with GAAP, misstates the applicable law. Conformity with GAAP is persuasive evidence of good faith and lack of intent but need not be dispositive of those issues. *See United States v. Weiner,* 578 F.2d 757, 785–86 (9th Cir.), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978); *United States v. Simon,* 425 F.2d 796, 805 (2d Cir.1969), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970).

loan; that the absence of actual reliance by Western undermines this otherwise logical conclusion; and they were entitled to present the complicity of Mr. Driggs *as evidence* of lack of capacity.

■ We recognize that the actions of Mr. Driggs may have had some relevance to the jury's determination of the capacity of the financial submissions to influence Western. We cannot, however, conclude that the district court abused its discretion in refusing to allow this evidence to be heard by the jury. Evidence of a "grand conspiracy" might well have (as the district court here concluded) induced confusion in the minds of the jury and distracted them from the true issue—whether the financial documents had the capacity to influence a *disinterested* bank or S & L.

■ Alternatively, we conclude that any error was harmless because the Defendants' arguments rest upon a rather dubious foundation. The undisputed testimony at trial established that Mr. Driggs could not by himself approve a loan; while we acknowledge that, as President of Western, Mr. Driggs likely wielded a great deal of influence, the equation of Mr. Driggs with Western (as the Defendants seem to do) is an assumption of questionable merit. Furthermore, the record indicates that the loan would not, under any circumstances, have gone through had the Defendants been unable to submit documents credibly establishing a net paper worth of $45 million. Indeed, the "grand conspiracy" with Mr. Driggs hinged upon such documentation; the extension of a loan to a corporation that was on paper not worthy of credit would hardly have aided Mr. Driggs in his efforts to placate federal regulators. These circumstances do not support a conclusion that Mr. Driggs forced Western to base a loan upon documents lacking adequate substantiation. It is hardly apparent, therefore, that evidence of the complicity of Mr. Driggs would have aided the Defendants' case at all.

### B. Exclusion of Three Pages of Exhibit 142

The Defendants claim that the district court erroneously prohibited them from dis-

playing redacted portions of Exhibit 142 during closing arguments. Exhibit 142 comprises two documents prepared by Mr. Brian O'Boyle, a loan officer of Western who was involved with the fateful loan to Trafalgar: first, a three page memo written in June of *1989* that summarizes the events surrounding the loan; and second, a one page diagram reflecting Mr. O'Boyle's understanding of the Circle C/TIOT/Trafalgar Capital step-up deal that was made during the June 30 meeting with Mr. O'Boyle, Mr. Sarno, and Trafalgar officials. During closing argument, defense counsel attempted to refer to a blow-up of page one of Exhibit 142. The Government objected, and the district court ruled that pages one through three (corresponding to the after-the-fact memorandum written by Mr. Boyle) had been excluded from evidence. The court indicated that defense counsel remained free to refer directly to Mr. O'Boyle's testimony. Somewhat flustered, defense counsel moved on and never revisited Mr. O'Boyle's testimony to any significant extent.

Much confusion reigns about what pages of Exhibit 142 were taken out of evidence at what point in time. The Defendants claim that only pages two and three (of the four-page exhibit) were ever explicitly excluded. The Government, agreeing that pages two and three were removed from evidence, asserts that page one had also been excluded at an earlier point in time. The transcript of the trial does not clearly reflect what happened, although the reporter's log indicates that all three pages were removed from evidence. The most revealing discussion among the parties of what may or may not have transpired took place roughly five months after the trial (during resolution of post-trial motions) and was based primarily upon the memories of the various attorneys; it is thus of little aid.

■ We need not resolve this dispute because we conclude that whatever error may have occurred was harmless. The excluded portions of Exhibit 142 referred to Mr. O'Boyle's evaluation of the worth of the June 22 and June 28 financial statements, indicated that Mr. Driggs had insisted that the loan be funded so as to help Western

with the regulators, and described the June 30 meeting at which Trafalgar officials and Mr. Sarno explained the step-up to Mr. O'Boyle. We have already concluded that it lay within the district court's discretion to exclude evidence of the conspiracy between Mr. Driggs and the Defendants. The Defendants admit that Mr. O'Boyle was open to cross-examination on the remaining topics covered by Exhibit 142; we are unable to see that any substantial additional benefit could have been gained from a memorandum written one year after the relevant events. An inquiry into Mr. O'Boyle's opinion as to the sufficiency of the financial submission was best undertaken during cross-examination— not by way of the introduction of a naked statement devoid of context and written long after the events in question. Similarly, the Defendants had ample opportunity to elicit from Mr. O'Boyle the details of the June 30 meeting; had they done so, they could have referred directly to this testimony during closing arguments.

### C. Admission of Evidence as to Trafalgar's Financial Condition

Prior to trial, the district court ruled that evidence of Trafalgar's poor financial condition would not be admissible. This ruling was not strictly enforced, however (or perhaps was rescinded; the record is again unclear), and evidence of Trafalgar's penury was introduced, primarily through the direct testimony of Trafalgar's bookkeeper. The Defendants renew their objections made at trial.

■ The probative value of evidence of financial need is, in general, questionable. It is hardly apparent that the rich seek money with less ardor or more scruples than the poor. We have recognized, however, that evidence of wealth (or lack thereof) may be relevant to certain crimes. *See, e.g., United States v. Feldman*, 788 F.2d 544, 557 (9th Cir.1986) (bank robbery), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *United States v. Saniti*, 604 F.2d 603, 604 (9th Cir.) (same), *cert. denied*, 444 U.S. 969, 100 S.Ct. 461, 62 L.Ed.2d 384 (1979). The Government suggests, not altogether unreasonably, that a violation of § 1014 can be

analogized to bank robbery for this purpose. We need not resolve this issue today because we hold that whatever error may have occurred was harmless. We do not think that Trafalgar's inability to pay certain bills could possibly have prejudiced the Defendants in the mind of the jury. Moreover, this record is not lacking for other evidence indicating that Mr. Knapp was driven primarily by his overweening ambitions and not by his short-term cash flow difficulties.

### D. Exclusion of the Price Waterhouse Evidence

■ Mr. Nash elicited testimony from Mr. A.P. Harwood, an accountant with Price Waterhouse, that Price Waterhouse had prepared the 1988 tax returns for Trafalgar and had accepted Trafalgar's representations as to its income and assets. The district court, after confirming that Price Waterhouse had neither conducted an independent investigation of the Trafalgar financial information nor done a formal audit of Trafalgar, struck the testimony as irrelevant. Mr. Nash did not object to the court's action at the time. *See* Gov't Nash Appendix Vol. III, at 2190. We therefore review for plain error, and disturb the verdict "only if, viewing the error in the context of the entire record, the impropriety 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings, or where failing to reverse a conviction would amount to a miscarriage of justice.'" *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir.1993) (quoting *United States v. Molina*, 934 F.2d 1440, 1446 (9th Cir.1991)).

■ Mr. Nash now asserts that Mr. Harwood's testimony was relevant because (1) Price Waterhouse, which risked criminal penalties by relying upon Trafalgar's representations, found those representations sufficiently trustworthy for its purposes; and (2) the fact that Price Waterhouse accepted Trafalgar's data tended to rebut the Government's argument that no "Big Eight" accounting firm would have "signed off" on an audit of Trafalgar. Mr. Nash may well be correct that his present argument demonstrates that Mr. Harwood's testimony was of some slight relevance. However, he failed to make this argument to the district court at the time the

testimony was stricken from the record; he failed even to object to the district court's action; and he has failed on appeal to demonstrate that the district court's decision strayed so far from the path as to constitute plain error. We therefore reject his contentions.

## IV. Access to the Courts and Other 6th Amendment Rights

Mr. Nash, who has graduated from law school (although, apparently, he has not been admitted to a state bar), chose to represent himself at trial. His efforts at self-representation were, however, somewhat encumbered by his status at the time of this trial as a prison inmate serving out a sentence under a prior conviction for falsifying tax documents.[13] He claims here that the resulting constraints upon his time and actions deprived him of his Sixth Amendment right to defend himself.

■ We agree that the Sixth Amendment demands that a *pro se* defendant who is incarcerated be afforded reasonable access to "law books, witnesses, or other tools to prepare a defense." *Milton v. Morris,* 767 F.2d 1443, 1446 (9th Cir.1985); *see also United States v. Robinson,* 913 F.2d 712, 717 (9th Cir.1990), *cert. denied,* 498 U.S. 1104, 111 S.Ct. 1006, 112 L.Ed.2d 1089 (1991). The right of access is not unlimited, but must be balanced against the legitimate security needs or resource constraints of the prison. *See Robinson,* 913 F.2d at 717; *Lindquist v. Idaho State Bd. of Corrections,* 776 F.2d 851, 858 (9th Cir.1985); *Milton,* 767 F.2d at 1446–47. We turn now to Mr. Nash's specific allegations of deprivation.

### A. Restricted Access to the Prison Law Library

Mr. Nash first contends that he was denied adequate access to his institution's law library. The record indicates that in the months prior to trial he was allowed to use the library for roughly 120 to 140 hours. After trial began, Mr. Nash had access to the library for approximately five hours per week.

■ After weighing the other legal resources available to Mr. Nash, we conclude that Mr. Nash was given adequate library time prior to trial to fashion his defense. We note, first of all, that Mr. Nash was not a lay person with no knowledge of the law, but had in fact graduated from law school. He therefore had no need to learn the essentials of procedure or criminal law. Furthermore, the central legal issue of the case—whether predictive statements or statements of opinion could violate 18 U.S.C. § 1014—was common to the defenses presented by all three of the defendants. With respect to this issue, therefore, Mr. Nash was able to draw upon the efforts of his co-defendants' counsel. The remaining issues relevant to Mr. Nash were not, as the district court noted, legal in nature, but turned largely on the facts of the case, which were matters within Mr. Nash's personal knowledge. Lastly, Mr. Nash had access to the skills and knowledge of an attorney appointed to assist him in the preparation of his defense and the filing of documents.

We are more troubled by the amount of library time allotted Mr. Nash during the trial. The prison library, apparently, is typically open only during the day; thus, a defendant who spends his or her day in court has little opportunity to visit the library during normal operating hours. This situation is hardly ideal. Nonetheless, while a prison must take steps to provide incarcerated defendants with reasonable access to legal materials, the rights of a *pro se* defendant must be balanced against institutional resource constraints. *See Robinson,* 913 F.2d at 717. Under all of the circumstances of this case, we are not prepared to hold that the access afforded Mr. Nash was unreasonably limited.

### B. Access to Witnesses

■ Mr. Nash next asserts that his access to witnesses (either in person or over the phone) was impermissibly restricted. This assertion is foreclosed by the district court's factual findings. *See* Gov't Nash Appendix Vol. II, at 516–17. The district court found that (1) Mr. Nash could receive visits

---

13. The two crimes, although similar in character, were unrelated.

from witnesses upon the provision of forty-eight hours notice and certain minimal personal information; (2) Mr. Nash did not submit a visitor list until June 19, 1993, four days after the beginning of the trial; following that submission, approval of visitor requests followed rapidly; (3) Mr. Nash could make monitored phone calls at all times, and, after May 25, could make two unmonitored calls per day; he made no such calls; and (4) Mr. Nash had access to co-defendant Sarno at pretrial hearings and during their joint trial. While Mr. Nash disputes the accuracy of these findings, he has not produced sufficient evidence for us to find them to be clearly erroneous.

Mr. Nash does credibly argue that his ability to make unmonitored telephone calls during trial was severely limited because he was at court during the hours in which unmonitored phone calls were allowed. After he brought this conflict to the court's attention (on June 22), the matter was remedied by June 25 (Mr. Nash was allowed to use the courthouse phone at lunch). This admitted restriction on his access to the telephone does not therefore seem so unreasonable as to merit reversal.

### C. Limitations on Access to Discovery Materials

The Government gathered some 250,000 pages of documents in preparation for this trial. Mr. Nash was allowed to review these documents and mark those that were relevant to his defense; the marked items were then copied for Mr. Nash at government expense. Roughly 6000 additional pages were identified by the Government and provided by the Government before trial. It is, however, undisputed that Mr. Nash was given only approximately twenty hours in which to inspect the 250,000 pages of material. He argues that this period of time was insufficient.

 While we agree that Mr. Nash's access to discovery materials was hardly optimal, we conclude that the limitations imposed on him were reasonable. The Government sensibly attempted to accommodate Mr. Nash's status by copying and identifying documents for him. While the time during

which Mr. Nash could survey the discovery materials was brief, the district court found that the documents relevant to Mr. Nash's case composed only a small fraction of the 250,000 pages collected by the Government and, furthermore, were readily identifiable. Mr. Nash points to no evidence that suggests that these findings were clearly erroneous. We note, moreover, that Mr. Nash's access to the documents was constrained, at least in part, by the needs of his co-defendants. We hold therefore that the time provided Mr. Nash was sufficient under the circumstances.

 Mr. Nash also contends that he was denied access to relevant personal papers (specifically, personal address books and day calendars) and that the Government failed to provide him with certain requested documents. The district court rejected the first of these claims on factual grounds, expressly declining to believe that Mr. Nash could not fit his address book and day calendar into the two boxes of material he was allowed in jail. In any event, Mr. Nash had the option to send his personal papers to his wife; he chose instead to leave his personal papers in storage at another facility. Mr. Nash does not point to any evidence that suggests that there findings are clearly erroneous, and they refute the claim at hand.

 The Government concedes that Mr. Nash never received two of the documents which he marked for copying. There is absolutely no evidence to support the conclusion that this omission was purposeful. Furthermore, the district court found that Mr. Nash never brought the omission to the court's attention during trial or otherwise sought to obtain the documents in a timely manner. Under these circumstances, the failure to deliver the documents was unfortunate but does not require reversal.

### V. Denial of the Request for a Continuance

 We review the denial of a motion to continue for abuse of discretion. *United States v. Robinson,* 967 F.2d 287, 291 (9th Cir.1992). We will find an abuse of discretion only where the denial was "arbitrary or unreasonable." *United States v. Torres-*

*Rodriguez,* 930 F.2d 1375, 1383 (9th Cir. 1991). We judge the denial of a motion to continue under the four-part test set forth in *United States v. Flynt,* 756 F.2d 1352, 1358 (9th Cir.1985). Mr. Nash has failed to adduce any evidence that would support a conclusion that the district court abused its discretion in refusing to postpone the trial. Mr. Nash's claims can be reduced to general allegations that a continuance would have allowed him to prepare a better defense. While we acknowledge that additional time can often be put to good use, such general allegations are insufficient to allow us to find an abuse of discretion.

## VI. Constructive Amendment of the Indictment

 Mr. Knapp contends that the indictment was constructively amended at trial in violation of his Fifth Amendment rights. *See Stirone v. United States,* 361 U.S. 212, 215–19, 80 S.Ct. 270, 272–74, 4 L.Ed.2d 252 (1960); *United States v. Homick,* 964 F.2d 899, 907 (9th Cir.1992); *United States v. Pisello,* 877 F.2d 762, 765–66 (9th Cir.1989); *United States v. Von Stoll,* 726 F.2d 584, 586–87 (9th Cir.1984).

> "An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." . . .
>
> . . . .
>
> In addition, courts have found constructive amendments where the crime charged was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved.

*Von Stoll,* 726 F.2d at 586 (quoting *United States v. Cusmano,* 659 F.2d 714, 718 (6th Cir.1981)). Mr. Knapp argues, in effect, that a constructive amendment occurred because the evidence presented at trial could have supported a conviction for bank fraud, a crime for which Mr. Knapp was not indicted. This contention is meritless.

 This is not an instance where the "crime charged was substantially altered at trial," *see id.,* but is rather a case where the crime proved at trial was precisely that charged in the indictment. The record indicates that the trial evidence does not differ materially from the allegations made in the indictment, not does the evidence support a conviction under some other statute in lieu of a conviction under § 1014. At most, it might be said that the evidence supports a conviction for violations of both of § 1014 and of other statutes. We note, however, that the Defendants were indicted for violations of § 1014 and that the district court instructed the jury only upon those crimes charged in the indictment. The Defendants may well have been guilty of bank fraud. That fact, however, does not require us to find an unconstitutional constructive amendment where the record is virtually devoid of any indication that such amendment occurred and where the record contains ample evidence to support a conviction consistent with the indictment.[14]

## VII. Refusal to Read the Indictment to the Jury

 This argument borders on the sanctionable. The record plainly reflects the fact that the Defendants, far from objecting to the district court's decision in this regard, applauded that result. *See* Gov't Knapp/Sarno Appendix (Case Nos. 93–50859 & 93–50860) Vol. I, at 4 ("I hope not. I continually object to [the reading of the indictment to the jury]. I don't think there is a rule that requires that." (statement by Mr. Sarno's counsel)); *id.* at 5 ("I think that[ ] [the district court's decision is] more than acceptable and quite common in my experience." (statement by Mr. Knapp's counsel)). The Defendants cannot now object in good faith or in good conscience.

---

14. Mr. Knapp also complains that the rhetoric of the prosecutor constructively amended the indictment at trial. The statements cited by Mr. Knapp as indicative of the Government's attempt to amend the indictment compare the Defendants' actions to those of bank robbers. *See* Knapp Reply Br. 25. We do not think it possible that the grand jury could have charged the Defendants with bank robbery rather than violations of § 1014, nor does it seem likely that the jury convicted them of making false statements because it believed them to be bank robbers.

## VIII. Sufficiency of the Evidence

 Messrs. Sarno and Nash each challenge the sufficiency of the evidence sustaining their convictions. Under the familiar standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *reh'g denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), the evidence supporting a conviction will be deemed sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789. We favor the Government with "all reasonable inferences which may be drawn" from the evidence. *United States v. Cuevas*, 847 F.2d 1417, 1421 (9th Cir.1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989). Neither Mr. Sarno nor Mr. Nash meets this stringent standard.

### A. Argument of Mr. Sarno

 As discussed earlier, the record contains more than ample evidence from which a jury could conclude that (1) the June 28 financial statement contained representations of fact; (2) the stock swaps had not closed; (3) the value of the Circle C was exaggerated in a fashion not permitted by GAAP;[15] and (4) the false representations in the June 28 submission were material to the funding of the loan. Knowledge and intent can easily be inferred from the actions taken by the Defendants first to "build" Trafalgar's balance sheet and then to disguise their misdeeds. No more is required in this respect.[16]

 Mr. Sarno also argues that (1) the audited financial statement was immaterial to the funding of the loan; and (2) he was, in any event, not responsible for any false statements made in the audit opinion letter. Neither assertion has any mooring to the evidence presented at trial. It is true that the bulk of the money was funded by Western prior to the receipt of the letter; it likewise must be acknowledged that the remaining money was provided almost simultaneously with the receipt of the audit. The loan agreement nonetheless required that the audit take place; Mr. O'Boyle, the Western official overseeing the Trafalgar loan, testified that the release of the final $2 million was contingent upon the result of the audit; and the Defendants' own actions belie the importance of the audit. This evidence, while not overwhelming, suffices to sustain the verdict. Mr. Sarno's remaining contention quite simply flies in the face of the trial testimony. Mr. Sarno structured the substitution of Nepenthe for TIOT; Mr. Sarno was instrumental in the creation of two false income entries for Trafalgar; Mr. Sarno worked with Mr. Nash to prepare audit footnotes that would, on paper at least, substantiate the fictions contained therein. Virtually no evidence exists from which the jury could infer Mr. Sarno's innocence. The evidence was certainly sufficient to sustain the conviction.

### B. Argument of Mr. Nash

Mr. Nash challenges virtually every element of the crimes of which he has been convicted. We address his claims in turn.

### 1. Were Representations of Fact Made by the Audit Opinion Letter?

 The essence of Mr. Nash's argument is that an accountant's opinion letter can never give rise to liability for "false statement." This premise is simply incorrect and may be rejected out-of-hand. *See United States v. Weiner*, 578 F.2d 757, 785–86 (9th Cir.) (analyzing defenses to criminal liability for false statements in audits), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978); *United States v. Simon*, 425 F.2d 796, 805 (2d Cir.1969) (same), *cert. denied*,

---

15. We need not resolve the debate between the Government and the Defendants as to the respective merits of cash flow and market value pricing. The evidence overwhelmingly indicated that a step-up in book value is not consistent with GAAP where the intermediate party (here, TIOT) is a captive entity. The Defendants' efforts to substitute Nepenthe for TIOT only buttresses this conclusion.

16. It is therefore unnecessary to address the other contested instances of falsehood allegedly contained in the financial submissions.

397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970).

■ Mr. Nash has likewise failed to demonstrate that the opinion letter prepared by him contained no representations that could be judged false. The audit letter made the following statements: "We have audited the accompanying combined balance sheet"; "[w]e conducted our audit in accordance with generally accepted auditing standards"; "[w]e believe that our audit provides a reasonable basis for our opinion"; "[i]n our opinion, the financial statements referred to above present fairly, in all material respects, [Trafalgar's financial status] in conformity with generally accepted accounting principles." Gov't Nash Appendix Vol. I, at 128. Even the last of these statements, which is plainly labeled an "opinion," could be considered "false" if the evidence were to show that Mr. Nash had issued the opinion letter with knowledge that GAAP had not been followed. The remaining statements are even more easily held to an objective standard of "falsehood." Construing these statements in the light most favorable to the Government, a reasonable juror could have found them to be representations of fact within the meaning of 18 U.S.C. § 1014.

### 2. Was the Audit Materially Incomplete and Did Mr. Nash Have Knowledge of this Fact?

Mr. Nash contends, first, that the audit was completed in conformity with GAAP, and, second, that he had no knowledge of any inaccuracies that may have existed. Each contention falls far short of meeting the standard set by *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560, *reh'g denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979).

Mr. Neely, an associate of Mr. Nash who worked with him on the audit, testified that he consulted with Mr. Nash about the Trafalgar audit on a daily basis throughout July 1988. He testified that the auditors never received acceptable substantiation for several material entries in Trafalgar's financial records; that Mr. Nash knew that these items had not been properly documented; that Mr. Nash was in almost constant contact with

Messrs. Knapp and Sarno in an attempt to produce appropriate records; and that the effort to substantiate the information contained in the audit continued well into the fall of 1988. Mr. Neely also testified that, in his professional opinion, the audit was incomplete. Mr. Neely's testimony is largely corroborated by that of Mr. Schumann and Mr. O'Brien, both of whom worked with Messrs. Knapp and Sarno on this scheme and both of whom testified under a grant of immunity. Mr. Morgan likewise testified as to the elaborate measures taken to create a paper trail that would justify the figures contained in the audit. All four witnesses portrayed Mr. Nash as a man trying to gather or create pieces of paper to support a foregone conclusion; when in the end his efforts at fabrication failed, Mr. Nash simply delivered the opinion anyway.

### 3. Materiality of the Audit

Mr. Nash's argument that the audit was not material to the full finding of the loan fails for the reasons given *supra.*

### 4. Exaggerated Asset Valuations and Mr. Nash's Knowledge Thereof

Mr. Nash, as did Messrs. Sarno and Knapp before him, contends that the evidence does not lend itself to a conclusion that the worth attributed to the Circle C or to the stock swaps was fictitious. Mr. Nash's argument as to the Circle C fails for the reasons given earlier. Mr. Nash's claims as to the stock swaps are similarly unpersuasive. At trial, representatives of the companies with whom Trafalgar was supposedly swapping stock testified that the audit figures were wildly inflated. These same representatives also testified that the stock swaps had not in fact occurred—a circumstance that would hardly support their inclusion as assets on Trafalgar's balance sheet.

Mr. Nash also argues that there was insufficient evidence for the jury to find that he knew of the financial hyperbole. We do not agree. Mr. Nash was a major stockholder in three of the companies with which Trafalgar allegedly swapped stock; the evidence supports the conclusion that these companies

were worth far less than was indicated by the audit; and the jury could therefore have reasonably inferred that Mr. Nash knew of this discrepancy. The record further indicates that Mr. Nash knew of and participated in the restructuring of the Circle C deal. The jury could thus have reasonably concluded that he was familiar with the inappropriate step-up in value. Lastly, the testimony of Mr. Neely and Mr. O'Brien places Mr. Nash in the middle of the ongoing efforts to substantiate the fictitious entries in Trafalgar's financial records.

### 5. Evidence of a Conspiracy

Abundant evidence suggests the existence of an agreement and an overt act sufficient to underpin the conspiracy conviction. Messrs. Nash and Sarno together prepared the audit and fabricated the documentation necessary to give it an illusion of propriety; they restructured the Circle C deal to substitute retroactively an allegedly independent party as the vital middle link of the Circle C step-up deal; they created a paper trail that would support the addition of fictitious fees to Trafalgar's otherwise negligible income stream; and they attempted to cover up the fact that the stock swaps had in fact never occurred. It could reasonably be inferred that all of these steps were taken with the knowledge and approval of Mr. Knapp, who retained final decision-making authority over the workings of Trafalgar. Any of these acts could stand as the overt act of the conspiracy. Taken together, they easily justify the inference that an agreement existed. *See United States v. Cloud,* 872 F.2d 846, 852 (9th Cir.), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989).

## IX. Prosecutorial Counts

### A. Improper Closing Argument

#### 1. Allusions to Bank Robbery

Mr. Nash cries foul because the Government, during closing argument, characterized the Defendants as bank robbers and drew parallels between their scheme and the classic take-the-money-and-run bank robbery. Mr. Nash did not object to these references at the time. We therefore review for plain error.

We acknowledge that the prosecutor's remarks were certainly less than kind to Mr. Nash. "Hard blows" are, however, often the essence of argument and, standing in isolation, do not constitute grounds for reversal unless the remarks impermissibly prejudice a defendant. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) ("[W]hile [the government] may strike hard blows, [it] is not at liberty to strike foul ones."); *United States v. Feldman,* 853 F.2d 648, 665 (9th Cir.1988) ("Hard blows are permissible in closing arguments and even when statements go beyond reasonable inferences made from the evidence, reversal is proper only if they were likely to have prejudiced the defendant."), *cert. denied,* 489 U.S. 1030, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989).

We do not see that the prosecutor's comments added a great deal to the Government's case other than emphasizing the somewhat obvious point that a wrongfully obtained loan harms a bank no less than does a bank robbery. However, we also do not think that the remarks prejudiced Mr. Nash to the extent necessary for plain error. It seems wildly implausible that the jury convicted Mr. Nash because it was inflamed by the talk of guns and notes and getaway cars.

#### 2. Improper Characterization of Testimony

The record indicates that on at least three occasions during closing argument the prosecution characterized statements made by the Defendants as "lies." No objection was made to these comments. We therefore review for plain error. We find none. The comments were made during closing argument, and the jury was properly instructed to treat the prosecution's statements as argument and not as evidence. It is hardly surprising that, in a case turning upon the "falsehood" of certain representations, the prosecution would attempt to persuade the jury that those representations were in fact lies. *See United States v. Molina,* 934 F.2d 1440, 1445 (9th Cir.1991) ("In a case that essentially reduces to which of two conflicting

stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying."); *cf. United States v. Birges*, 723 F.2d 666, 672 (9th Cir.) (prosecution's characterization of defense theory as a "fabrication" "well within the bounds of acceptable comment"), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984). We therefore fail to see what prejudice Mr. Nash suffered that would support a finding of plain error.

## B. Vouching

 Mr. Nash contends that the Government vouched for three of its witnesses. We review accusations of vouching under the multi-faceted balancing test set forth in *United States v. Necoechea:*

> [W]e consider a number of factors including: the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.

986 F.2d 1273, 1278 (9th Cir.1993). No objection was made at trial to the allegedly improper remarks. We therefore review for plain error. We again find none.

Mr. Nash first contests the propriety of four comments made during rebuttal argument in reference to the testimony of Mr. Brourman (an attorney who represented Mr. Knapp's ex-wife during divorce proceedings):

> You actually, ladies and gentlemen, heard a much truer and more candid view or statement of how the defendants viewed the Circle C transaction from Mr. Brourman.
>
> . . . .
>
> . . . There is no reason for him to make this up. You heard him, he came to the FBI with this information.

Now, you also now [sic] that Mr. Brourman is telling the truth because you heard Mr. Goldberg testify yesterday. . . .

> So, if the defendants are right and Mr. Brourman is just making it up, then he started four years ago, ladies and gentlemen, and I suggest to you that is not what's happening. Mr. Brourman told you he remembered that conversation because [sic] and he was shocked by it and he came in here and he told you the truth.

Gov't Nash Appendix Vol. III, at 2555–56.

 The first three comments cannot properly be classified as vouching. The first comment, although perhaps straying close to the edge of permissible argument, in essence compares two accounts of the same transaction [17] and asks the jury to draw the inference that Mr. Brourman's version is more accurate. An argument of this type is not improper. *See United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir.1991). The second comment merely noted that Mr. Brourman had no incentive to lie and that he had volunteered his information without any prompting by the Government. This does not qualify as vouching. The penultimate statement is simply an argument that Mr. Brourman's testimony was corroborated by the testimony of other witnesses. This also fails to qualify as vouching.

 The final comment is more problematic. We have held that statements bearing on credibility that are plainly advanced as argument do not constitute vouching. *See Necoechea*, 986 F.2d at 1279 ("I submit to you that she's telling the truth" held not to be vouching). The phrase, "I suggest to you," does precede the statement, "he told you the truth." However, it can hardly be said that the former supposition plainly modifies the latter affirmation of Mr. Brourman's credibility. We need not resolve this issue because we do not find the impropriety, if any, to rise to the level of plain error. Mr. Brourman's testimony was introduced only against Mr. Knapp and not against Mr. Nash. Mr. Brourman's testimony, in any

---

**17.** During the divorce negotiations, Mr. Brourman had questioned Mr. Knapp about the worth of his assets, including the Circle C. According to Mr. Brourman, Mr. Knapp indicated in response that the Circle C was almost valueless.

event, was hardly vital to the verdict. We cannot therefore conclude that a miscarriage of justice has occurred.

Mr. Nash next complains of the following statement made by the Government during rebuttal argument: "So you know that Schumann and O'Brien are telling you the truth because the other evidence is consistent. It says the same thing." Gov't Nash Appendix Vol. III, at 2573. As discussed above, commentary of this type is not vouching. It is, rather, and invitation to the jury to make the inference that consistent evidence is of greater reliability than is inconsistent evidence. As such, it falls well within the bounds of permissible argument.

■ Mr. Nash also argues that the Government improperly elicited testimony from Messrs. Schumann and O'Brien that their immunity agreements with the Government required that they testify truthfully. This claim fails. The Defendants stridently attacked the credibility of Messrs. Schumann and O'Brien in opening argument. *See* Gov't Nash Appendix Vol. I, at 173–74. The district court gave a general instruction as to the suspect credibility of those who testify pursuant to immunity agreements. We have previously held that the introduction of the truthfulness condition of an immunity arrangement under these circumstances does not constitute plain error. *See Necoechea*, 986 F.2d at 1277–80; *United States v. Monroe*, 943 F.2d 1007, 1013–14 (9th Cir.1991), *cert. denied*, 503 U.S. 971, 112 S.Ct. 1585, 118 L.Ed.2d 304 (1992); *United States v. Lew*, 875 F.2d 219, 224 (9th Cir.1989).

■ Lastly, Mr. Nash argues that the Government vouched for Mr. O'Brien during opening argument by indicating that Mr. O'Brien would testify that he had lied to the FBI before but was telling the truth now. We note that Mr. O'Brien did in fact testify to this effect; the prosecution's characterization of his testimony was therefore accurate. We need not decide if this comment qualified

as vouching because, in any event, we conclude that it does not rise to the level of plain error. The tainted credibility of a witness in Mr. O'Brien's position was apparent to the jury despite the prosecution's efforts. We therefore do not think it possible that this comment had any effect on the verdict.

#### C. *Griffin* Error

The Government concedes that the prosecution, while objecting to a statement made by Mr. Nash during his closing argument, improperly commented upon Mr. Nash's failure to testify. Mr. Nash contends that this error mandates reversal. He is incorrect.

■ The Fifth Amendment prohibits the prosecution from commenting on a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 611–12, 85 S.Ct. 1229, 1231–32, 14 L.Ed.2d 106 (1965). However, "[w]e will not reverse when a prosecutorial comment is a single, isolated incident, does not stress an inference of guilt from silence as the basis of conviction, and is followed by a curative instruction." *United States v. Tarazon*, 989 F.2d 1045, 1052 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 155, 126 L.Ed.2d 116 (1993). Here, only one improper comment was made;[18] it did not infer guilt from silence; and the district court immediately and *sua sponte* chastised the prosecution and gave a curative instruction to the jury. *Tarazon* therefore controls this case.

■ Mr. Nash's second alleged *Griffin* error is baseless. During rebuttal, the prosecution made the following comments:

What is the business purpose of [the double sale of the Circle C]? The defendants, ladies and gentlemen, want to pretend that the "flip" or other double sale didn't happen. They didn't talk about it very much yesterday if you think back and they didn't talk about it because they don't want you to think about it. If you think about it, you will see that the purpose and the only

---

**18.** The prosecutor made the following comment: "Your Honor, I'm sorry, again I need to object. If Mr. Nash wanted to testify, he could have." Nash Appendix Vol. IV, at 931. To the extent that Mr. Nash claims that two improper comments were made by the prosecution at this time,

he is simply wrong. The following statements do not violate *Griffin:* "I'm going to need to object here. There is no evidence of that. Mr. Nash is, in effect, testifying with respect to all these numbers." Nash Appendix Vol. IV, at 930.

purpose of the "flip" or the double sale was to inflate the Circle C on the Trafalgar financial statements.

Gov't Nash Appendix Vol. III, at 2539. Taken in context, it is apparent that the prosecutor is referring not to the failure of the Defendants to testify but rather to the failure of defense counsel to discuss the double sale during the Defendant's closing arguments (which, we note, occurred on the day preceding the Government's rebuttal). Commentary on the defense, as opposed to the defendant, does not qualify as a *Griffin* violation. *See United States v. Mares,* 940 F.2d 455, 461 (9th Cir.1991).

## X. Assorted Other Claims Raised by Mr. Nash

### A. Speedy Trial Act

This claim is wholly frivolous. Mr. Nash's argument ignores both the plain language of the statute and our precedents interpreting that statute. A defendant must be tried within seventy days of the *later* of the date of indictment or the date on which a defendant appears before an officer of the court in which the case is pending. 18 U.S.C. § 3161(c); *United States v. Palomba,* 31 F.3d 1456, 1462 (9th Cir.1994). Eighty-two days passed between the date on which Mr. Nash was arraigned and the beginning of trial; Mr. Nash concedes that twenty-two of these days were excludable. His claim is therefore meritless.

### B. Recusal

■■■ We note that Mr. Nash, apparently, has yet to file a properly noticed motion to disqualify the judge assigned to his case. Mr. Nash instead, on the day before trial, filed a pleading with the district court asking that a determination of potential conflict be made by an outside judge. The district court

properly declined to resolve the issue and informed Mr. Nash that he could, if he wished, file a properly noticed motion seeking a determination of the matter. Mr. Nash did not pursue the question further before filing this appeal. Mr. Nash has not attempted to excuse his delay in filing the proper motion. He cannot now raise this issue on appeal. *See United States v. Conforte,* 624 F.2d 869, 879 (9th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).[19]

### C. Appearance in Prison Garb

■■■ Mr. Nash's claim that he was compelled to appear before the jury in identifiable prison garb fails for any number of reasons. Mr. Nash failed to object to his appearance prior to the commencement of voir dire and thereby waived his right to assert compulsion. *See United States v. Rogers,* 769 F.2d 1418, 1423 (9th Cir.1985). The district court found as a matter of fact that Mr. Nash's clothing was not identifiable as prison garb; Mr. Nash points to nothing in the record that would suggest that this finding was clearly erroneous. Finally, the district court engaged in a "charade" that was calculated to prevent the jury from somehow identifying the clothing as prison wear: The district court informed the jury that Mr. Nash's luggage has been lost at the airport and that Mr. Nash has only casual clothes to wear until his normal attire arrived. We have previously approved the use of a charade under similar circumstances, *see United States v. Halliburton,* 870 F.2d 557, 559–62 (9th Cir.), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989).[20]

### D. Venue

Mr. Nash's argument contesting the propriety of venue is completely lacking in merit. Title 18 U.S.C. § 3237(a) expressly pro-

---

19. Even if we were to construe his present appeal as a properly filed motion seeking recusal or disqualification, we would rule that the motion was not timely. *See Preston v. United States,* 923 F.2d 731, 733 (9th Cir.1991). Mr. Nash has not alluded to any lack of knowledge that prevented him from filing the proper motion, and he has admitted that he was informed of the procedures that were to be followed. He therefore has no excuse for his delinquency.

20. While the use of the "charade" here is not reversible error, we do not approve of telling jurors outright lies. While the shift from that to the charade is subtle, it is an important subtlety. The court could have informed the jury that due to a misfortune, Mr. Nash had only casual clothes to wear at this time.

vides that offenses "begun in one district and completed in another, or committed in more than one district, may be ... prosecuted in any district in which such offense was begun, continued, or completed." It is not disputed that the audit and the financial packages were prepared in Los Angeles. These facts constituted major parts of the offense conduct. Venue was therefore proper in the Central District of California.

## XI. Sentencing

■ The Defendants jointly raise a number of challenges to their sentences, which were computed under the 1987 version of the Sentencing Guidelines. We review the district court's legal interpretation of the Guidelines *de novo* and its factual findings for clear error. *United States v. Mullins*, 992 F.2d 1472, 1478–79 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 556, 126 L.Ed.2d 457 (1993).

### A. Use of § 2F1.1

■ The Defendants acknowledge that the Sentencing Guidelines suggest that violations of § 1014 should be sentenced under § 2F1.1 of the Guidelines. They nonetheless argue that § 2F1.1 is inapplicable to them because their crimes involved "false statements" rather than "Fraud or Deceit," language which forms part of the heading to this section. One could question the semantics that form the gravamen of their argument, but such an inquiry is hardly necessary. The Guidelines states that § 2F1.1 should apply unless another section is more appropriate; the Defendants have not put forth another section of the Guidelines as a more reasonable alternative; the Defendants have not cited one case that gives any credence to their novel argument; and their claims do not possess sufficient inherent merit to carry the day. We therefore affirm the use of § 2F1.1.

### B. Credit for "Profits" Realized by Western

■ The district court found that the loss attributable to the conspiracy was $11 million. *See* Gov't Knapp/Sarno Appendix (Case Nos. 93–50859 & 93–50860) Vol. I, at 12–14.

Mr. Knapp contends that this calculation was erroneous because the district court failed to award the Defendants adequate credit for profits realized by Western upon the loan. We disagree. The district court found as a matter of fact that the profits allegedly accruing to Western were both fictional and illegal (as contrary to the accounting regulations applicable to Western at the time). Mr. Knapp has given only bald assertions in support of his claim that this finding was clearly erroneous. That is not sufficient to compel or even suggest the result he seeks. The district court's determination of loss is in all other respects amply supported by the record and cannot therefore be characterized as clearly erroneous.

### C. Amount of Loss Attributable to Messrs. Sarno and Nash

■ It is settled law that a conspirator's sentence is to be based not on the actions of the conspiracy as a whole but rather on those actions that fall within the "scope" of his or her agreement or that are otherwise "reasonably foreseeable." *See* U.S.S.G. § 1B1.3 & cmt.; *United States v. Petty*, 992 F.2d 887, 890 (9th Cir.1993). Mr. Sarno does not argue that the actions leading to the funding of the loan by Western fell outside the scope of the conspiracy. Rather, he contends that Trafalgar's failure to repay the loan (and, hence, the loss of Western's money) resulted from the subsequent conduct of Messrs. Knapp and Driggs—conduct over which he had no control and which was itself not a part of the conspiracy. He asserts, therefore, that his sentence should turn on how much of Western's loss was foreseeably caused by his conduct.

■ We disagree. A sentence calculated pursuant to the loss tables of § 2F1.1 is properly based on actual loss notwithstanding the fact that this loss may be greater than the intended, expected, or foreseeable loss. *See United States v. Shaw*, 3 F.3d 311, 312–14 (9th Cir.1993). Thus, "[a]ny portion of the total loss sustained by the victim as a consequence of factors extraneous to the defendant's criminal conduct is *not* deducted from total 'victim loss' prior to the determination of the applicable guideline sentencing

range [ ] pursuant to U.S.S.G. § 2F1.1(b)(1)." *United States v. Shattuck,* 961 F.2d 1012, 1016–17 (1st Cir.1992) (collecting cases). Rather, the defendant may seek a downward departure to mitigate distortions occasioned by forces beyond the defendant's control. *Id.* It may well be true that the failure to repay the loan was no fault of Mr. Sarno; there is no doubt, however, that he conspired to obtain the money in the first instance. It seems apparent that it was reasonably foreseeable that the falsification of documents in support of a loan application might lead to the approval of that loan request. Hence, the funding of the loan can be attributed to Mr. Sarno. His remedy, therefore, was to seek a downward departure, which in fact was sought and denied by the district court. That denial is not reviewable upon appeal. *United States v. Belden,* 957 F.2d 671, 676 (9th Cir.), *cert. denied,* 506 U.S. 882, 113 S.Ct. 234, 121 L.Ed.2d 169 (1992).

Mr. Nash also questions whether the conduct that led to Western's loss was "reasonably foreseeable" or within the scope of his agreement. We believe that it was, and therefore affirm the district court's finding for essentially the reasons given above.

### D. Upward Departure for "A Loss Substantially in Excess of $5 Million"

█ The district court departed upward one level in its calculation of the Defendants' offense levels because it found that they had caused a loss substantially greater than $5 million. The Defendants object. We review upward departures under the three-part inquiry set forth in *United States v. Lira–Barraza,* 941 F.2d 745 (9th Cir.1991) (en banc) (interpreting 18 U.S.C. § 3553(b)). We ask, first, whether the district court identified an aggravating factor not adequately taken into account by the Guidelines; second, whether the facts support the existence of the identified circumstance; and third, whether the departure was itself "reasonable." *See id.* at 746–47.

█ Application of this test to the departure at hand demonstrates that the departure was undoubtedly justified. First, the applicable version of the Guidelines authorized a departure for losses "substantially

exceeding" $5 million, the maximum loss then covered by the loss table. *See* U.S.S.G. § 2F1.1 cmt. n. 10. Second, the district court found a loss of $11 million; as noted above, the Defendants have failed to demonstrate that this finding was clearly erroneous. Third, the one-level departure was reasonable under the circumstances. The district court expressly, and sensibly, extrapolated from the numerical sequence followed by the applicable loss table (which increased the offense level by one for each doubling of the loss).

### E. Adjustment for Use of a Special Skill

Messrs. Nash and Sarno each challenge the upward adjustment imposed under U.S.S.G. § 3B1.3. Mr. Nash contends that accounting is not a "special skill" within the meaning of the Guidelines. This argument is defeated by reference to the Guidelines themselves, which expressly indicate that an accountant possesses a special skill. *See* U.S.S.G. § 3B1.3 cmt. n. 2. Mr. Sarno, while recognizing that accounting is a special skill, suggests that his skill at accounting did not significantly facilitate his criminal efforts. This claim also fails.

█ Mr. Sarno offers only bare conclusory allegations to support his contentions. The evidence in the record overwhelmingly demonstrates that Mr. Sarno suggested the stock swap method of "building a balance sheet"; that Mr. Sarno's representations as to the propriety of the step-up assuaged Mr. O'Brien's concerns; and that Mr. Sarno initiated the Nepenthe substitution as a means of concealing the falsehoods in the June 28 submission. The district court did not therefore abuse its discretion in awarding this enhancement.

### F. Adjustment for More Than Minimal Planning

Messrs. Nash and Sarno argue that their conduct was insufficiently complex to support the imposition of this upward adjustment. We are not persuaded. Comparison of the facts of this case to the examples analyzed in the commentary to the Guidelines easily sup-

ports the propriety of the enhancement. *See* U.S.S.G. § 1B1.1 cmt. n. 1(f).

### G. Adjustment for "More Than Minimal Planning" and for Being an "Organizer/Manager"

Mr. Knapp claims that the upward adjustments for "more than minimal planning" and for being an "organizer/manager" are mutually exclusive. Mr. Knapp's contention in this regard is foreclosed by *United States v. Kelly*, 993 F.2d 702, 705 (9th Cir.1993) (approving imposition of both enhancements).

### H. Upward Departure for Jeopardizing the Safety and Soundness of Western.

The district court assessed a two-level upward departure for jeopardizing the safety and soundness of a federally insured financial entity. In imposing this adjustment, the district court looked to a post–1988 revision of the Guidelines that mandates a four-level adjustment for similar conduct. *See, e.g.,* U.S.S.G. § 2F1.1(b)(6)(A) (1994). The Defendants jointly contest the validity of this departure. We review under the test set out in *United States v. Lira–Barraza*, 941 F.2d 745 (9th Cir.1991). We reverse.

▆▆▆ The Government does not dispute that the loan obtained by the Defendants represents only a tiny fraction of the hundreds of millions of dollars of red ink in which Western wallowed. The district court nonetheless found that the losses attributable to the Defendants "substantially increased the risk and magnitude of [the] insolvency." Gov't Knapp/Sarno Appendix (Case Nos. 93–

50859 & 93–50860), Vol. I, at 17. We cannot agree and therefore conclude that under these circumstances the upward departure was unreasonable and unjustified. While we do not deny that the Defendants' actions contributed to Western's financial difficulties, the record indicates that Western suffered from losses of roughly $500 million—$200 million of which could be attributed to a single loan. The $11 million lost to the Defendants thus represents only two percent of Western's bad debt—a fraction that we do not think can be characterized as "substantial." [21] An upward departure is not warranted simply because a victim suffered from a multitude of ills, but it must instead be based upon harm that can reasonably be linked to the Defendants. Such is not the case here; the district court therefore erred in imposing this upward adjustment.[22]

### I. Was Mr. Knapp Properly Sentenced?

Mr. Knapp argues that his sentence exceeds the statutory maximum. He is incorrect. His arguments to the contrary are wholly frivolous. *See* U.S.S.G. § 5G1.2(d) (June 1988); *United States v. Brady*, 928 F.2d 844, 849–50 (9th Cir.1991).

### J. Denial of an Evidentiary Hearing

▆▆▆ Mr. Sarno has failed to demonstrate that the district court abused its discretion in rejecting the request for an evidentiary hearing. A district court may permissibly deny a hearing where a defendant is allowed to rebut the recommendations and allegations of the presentence report either orally or through the submission of written affidavits

---

**21.** There is some evidence in the record that the $11 million was the straw that broke the bank (to mingle metaphors). We do not think, however, that the departure can hang upon an accident of timing. It would not be reasonable to attribute to the loan a significance greatly out of proportion to its size simply because the loan came due at a poor time.

**22.** We note, moreover, that the district court's reliance upon the post–1988 adjustment raises profound *ex post facto* clause concerns. *See United States v. Kopp*, 951 F.2d 521, 526 & n. 8 (3d Cir.1991); *United States v. Canon*, 66 F.3d 1073 (9th Cir.1995); *cf. Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). It is hardly farfetched to conclude that

§ 2F1.1(b)(6)(A) was enacted in response to the S & L crisis to punish quite harshly the financial looting of federally insured banking institutions. Hence, in drawing upon § 2F1.1(b)(6)(A) to identify behavior not adequately covered by the Guidelines, the district court enhanced the Defendants' punishment because of an after-the-fact societal judgment that the harm associated with their deeds was greater than previously supposed. This is precisely the result forbidden by the *ex post facto* clause. *But see United States v. Willey*, 985 F.2d 1342, 1350 (7th Cir.1993) (concluding that it is reasonable to identify gaps in the older Guidelines by reference to adjustments codified in later revisions).

or briefs. *United States v. Baker*, 894 F.2d 1083, 1084–85 (9th Cir.1990). In this case, Defendants Sarno and Knapp both submitted written briefs and were allowed to make a final oral presentation to the court. Mr. Sarno's contention is therefore fatally flawed.

### K. Denial of an Evidentiary Hearing on Matters Relating to Restitution

■ Mr. Sarno complains that the amount of restitution was fixed without benefit of an evidentiary hearing. His argument lacks any credible foundation in law. There is no right to an evidentiary hearing so long as the facts that prove dispositive at sentencing find support in the record. *United States v. Kimball*, 975 F.2d 563, 568 (9th Cir.1992), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993).

### L. Calculation of Mr. Nash's Criminal History

■ Mr. Nash claims that his two convictions are related and that his sentence should be adjusted to reflect this linkage. He offers absolutely no substantiation for this claim. Although both crimes utilized his knowledge of accounting, the subject matter of the two acts was unconnected and his earlier criminal activities predated this scheme by several months. His argument therefore lacks any basis in fact and is properly rejected.

His contention that convictions currently on appeal should not factor into the calculation of criminal history was explicitly rejected by this court in *United States v. Mackbee*, 894 F.2d 1057, 1058 (9th Cir.), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2574, 109 L.Ed.2d 755 (1990).

### M. Restitution by Mr. Nash

■ Mr. Nash appeals the restitution order issued by the district court. We review orders of restitution for an abuse of discretion and the factual findings underpinning such orders for clear error. *See United States v. Smith*, 944 F.2d 618, 623 (9th Cir. 1991), *cert. denied*, 503 U.S. 951, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992). The district court did not here abuse that discretion. Mr. Nash's protestations to the contrary, the present insolvency of a defendant does not bar restitution where the district court finds that a defendant will have a future ability to make restitution. *Id.* at 623. The district court expressly found that Mr. Nash's business acumen and education were such as to justify the restitution imposed irrespective of future licensing difficulties. *See* Gov't Nash Appendix Vol. I, at 104. Mr. Nash points to no evidence that would lead us to conclude that this finding of fact is clearly erroneous. The restitution order therefore lies within the district court's discretion.

## XII. Denial of Right of Allocution

Mr. Nash contends that the district court denied him his right of allocution. *See United States v. Carper*, 24 F.3d 1157, 1158, 1162 (9th Cir.1994); *United States v. Medrano*, 5 F.3d 1214, 1219 (9th Cir.1993). We agree.

■ In the initial phase of the sentencing hearing, the district court curtly silenced Mr. Nash, stating, "I don't want you speaking to the Court unless the Court asks you a question." Nash Appendix Vol. IV, at 958. Our review of the record suggests that the timidity thereby instilled in Mr. Nash significantly hindered his later efforts at allocution. The relevant exchange between the district court and Mr. Nash went as follows:

> The Court: ... And I will hear from defendant Nash, if he wishes, as to what would be the appropriate sentence within that range.

> Mr. Nash: Of course, Your Honor, I would respectfully argue for the bottom of the Guidelines.

> Is that the only issue that the Court wants to hear from me on?

> The Court: Yes.

Nash Appendix Vol. IV, at 960–61. While Mr. Nash was nominally given an opportunity to speak, it is apparent from the record that he had taken the district court's admonition to heart and was consequently deterred from speaking freely. We refuse to countenance such court-inspired reticence and therefore hold that the district court denied Mr. Nash his right of allocution. The denial was not harmless because the district court had the discretion to sentence Mr. Nash to a

shorter sentence. *See Carper*, 24 F.3d at 1162. We therefore reverse Mr. Nash's sentence and remand this matter for further proceedings consistent with this opinion.

### XIII. Prosecutorial Misconduct

 The record confirms that the Government sought and received a separation order that prevented Mr. Nash from seeing his brother, who was his partner at the time of the Trafalgar audit and who was also incarcerated at the time of trial. Mr. Nash credibly alleges that this separation order was lifted only at the price of a stipulation exacted from Mr. Nash. This stipulation stated that the brother had no knowledge of any documents relating to Trafalgar Capital. Mr. Nash contends that the Government's reliance upon this form of coercion—in effect, not allowing him access to his brother unless he agreed not to call the brother at trial— constituted prosecutorial misconduct because it limited his access to a possibly exculpable witness.

We note that the Government does not deny that the stipulation was, in fact, extracted from Mr. Nash. The Government, moreover, offers no explanation as to why Mr. Nash was prevented from seeing his brother. The Government's argument that Mr. Nash failed to object to the stipulation at trial and is therefore bound to it, *see United States v. Ferreboeuf*, 632 F.2d 832, 836 (9th Cir.1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 368 (1981), misses the point. The central thrust of Mr. Nash's claim is that the Government took affirmative steps to prevent him from communicating with a potential witness. However, once the Defendant executed the stipulation, the separation order was lifted. Thus, he could have talked with his potential witness. That would have left him in a position to communicate with the *potential* witness. We are not told whether he in fact took advantage of that opportunity. If he did and discovered any relevant testimony, he should have raised that with the trial court and made a motion to relieve him

of the stipulation. While he complained of the coerced "stipulation," he made no motion or suggestion that his brother had relevant testimony to give. In light of the generalized way in which the issue was raised in the trial court, it is understandable that the trial court did not address the matter—it had no motion to rule on. For these reasons, while not indicating any approval of the Government's conduct in obtaining the stipulation, we find no reversible error.

### XIV. Issues Arising under Messrs. Knapp and Sarno's Motion for New Trial

#### A. Brady claims [23]

 The law governing the disclosure by the prosecution of evidence beneficial to a defendant is well-settled. The suppression by the government of material favorable evidence violates due process and requires that the tainted conviction be vacated. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Kyles v. Whitley*, —— U.S. ——, —— —— ——, 115 S.Ct. 1555, 1565–67, 131 L.Ed.2d 490 (1995). The rule of *Brady* and its progeny operates even in the absence of a defense request for favorable evidence and extends to both exculpatory and impeachment evidence. *See Kyles*, —— U.S. at ——, 115 S.Ct. at 1565; *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (plurality opinion). Suppressed evidence is held to be material " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles*, —— U.S. at ——, 115 S.Ct. at 1565 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (plurality opinion)). "A 'reasonable probability' of a different result is . . . shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles*, —— U.S. at ——, 115 S.Ct. at 1566 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. at

---

**23.** In this section we address both the *Brady* claims raised in the initial appeals, cases 93–50859 and 93–50860, and those asserted in the subsequent appeals from the district court's denial of the Defendant's Motions for New Trial,

cases 95–50270 and 95–50271. The claims referring to the testimony of Mr. Reynolds and Mr. Von Hoffman were made in the initial appeals; the remainder were raised in the subsequent appeals.

3381). We determine the existence of a "reasonable probability" based upon the cumulative impact of all the evidence suppressed in violation of *Brady*. *See Kyles*, —— U.S. at ——–——, 115 S.Ct. at 1567–69.

The Defendants jointly identify as *Brady* material the declarations and statements of eight witnesses who, it is claimed, revealed exculpatory evidence to the Government that was never disclosed to the defense. We address each in turn and conclude by assessing their cumulative probative weight.

Mr. Don Reynolds, the Chief Financial Officer of Trafalgar, testified before the grand jury that in his opinion the Trafalgar financial statements were accurate. Although this testimony was apparently not revealed to the Defendants, Mr. Reynolds' opinion was inadmissible because he admitted to a limited knowledge of accounting. *See* Fed.R.Evid. 701. Non-disclosure therefore did not give rise to a *Brady* violation. *United States v. Kennedy*, 890 F.2d 1056, 1058–59 (9th Cir. 1989), *cert. denied*, 494 U.S. 1008, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990). Its worth in any event was negligible given the latent taint of bias and self-interest. It seems highly unlikely that a CFO would admit to a belief that the company's financial statements were inaccurate.

Mr. Von Hofmann, the owner of Geothermal, opined in interviews with the Government that the Geothermal stock swap had closed as of June 28, 1988. This testimony would admittedly have been of some moment in refuting the Government's contentions as to that particular transaction. Mr. Von Hofmann's opinion, however, is belied by the Defendant's own actions following the funding of the loan. In any event, this statement does not address, much less call into question, the other misrepresentations contained in the June 28 submission.

Third, Mr. Rene Morentin, a Trafalgar employee, indicates in two declarations provided to the Defendants after trial that he informed the Government that in his opinion the financial submissions lacked the capacity to influence Western; that he had learned

that Western did not rely upon the submissions in approving the loan; that he had heard that the full details of the Circle C transaction were conveyed to Western; and that he had participated in conversations in which Messrs. Schumann and O'Brien had told Mr. Knapp that the financial documents had been prepared in accordance with GAAP. The first and third statements were, respectively, an inadmissible lay opinion and hearsay and do not therefore qualify as *Brady* violations. *See Kennedy*, 890 F.2d at 1058–59. The second statement lacks any evidentiary foundation and is, moreover, irrelevant to a conviction under § 1014. The fourth statement was substantially disclosed to the defense and does not in any event contradict the trial testimony of Mr. O'Brien, in which he admitted that he had once allowed himself to believe that the financial documents were accurate. Cumulative evidence does not give rise to a *Brady* violation. *See Kennedy* at 1061.

Fourth, the Defendants point to statements made by Mr. Gary Bradley, one of the sellers of the Circle C, in a letter written to the sentencing judge on behalf of Mr. Knapp. Mr. Bradley indicated that he had told the Government that he considered Mr. Bill Morgan to be a "liar and a cheat" who was "out to get" Mr. Knapp. The defense asserts that this information was not relayed to it by the prosecution. We note that the disclosure of Mr. Bradley's grand jury testimony to the defense communicated the essence of his opinion of Mr. Morgan. The defense, moreover, knew that Mr. Morgan disliked Mr. Knapp and desired to see him in prison, and cross-examined him extensively on these points. The defense, lastly, knew that Mr. Bradley was willing and in fact eager to testify at Mr. Knapp's trial. A choice was made not to call Mr. Bradley to the stand.[24] The Defendants cannot now stake a claim upon that choice.

Fifth, Mr. Allin Karls, an insurance businessman who had dealings with Messrs. Knapp and Sarno, indicates in a declaration provided to the Defendants after trial that he

---

**24.** This decision may have been a wise one. Mr. Bradley would have testified that the value as-

cribed to the Circle C was quite high.

had informed the Government that stock swaps could be legitimate transactions with real economic substance. This evidence is cumulative of testimony obtained by the Defendants upon cross-examination of Mr. Schumann, one of the Government's financial witnesses. It therefore does not rise to the level of a *Brady* violation. We are, in any event, unable to discern how this information exculpates the Defendants. Although the Government did question the authenticity of the stock swaps documented in Trafalgar's financial submissions, the main thrust of the Government's case in this regard was that these stock swaps were phantom transactions. Thus, the possible validity under standard accounting practices of a hypothetical stock swap simply does not appreciably aid the defense.

Sixth, the Defendants refer to statements allegedly made to the Government by Mr. Robert Reade, an outside director of Western who approved the Trafalgar loan. These comments are memorialized in a declaration made by a private investigator in the Defendants' employment. This declaration purportedly recounts a post-trial interview between Mr. Reade and the private investigator. Mr. Reade, however, disputes the contents of this declaration and has elaborated upon the many inaccuracies reflected therein. *See* Gov't Knapp/Sarno Appendix (Case Nos. 95–50270 & 95–50271) Vol. I, at 7–9. These clarifications dispel any possibility that whatever information may have been withheld was material. We note, in any event, that Mr. Reade testified at trial and that the alleged *Brady* information in no way contradicts or substantially supplements that testimony.

Seventh, the Defendants assert that the Government suppressed evidence that Exhibit 142 represented Mr. O'Boyle's "best memory" of the relevant events of June and July, 1988. We are in grave doubt as to whether this information was kept from the Defendants. Our review of the trial transcript suggests that it was plain that Exhibit 142 represented Mr. O'Boyle's best recollection of the Trafalgar loan. Notwithstanding the strong possibility that disclosure was made or was unnecessary, we are unable to discern how disclosure could have aided the Defendant's cause. The excluded portions of Exhibit 142 were kept out because the evidence contained therein was irrelevant. Mr. O'Boyle's state of mind would have had no impact upon this decision. The Defendants' arguments to the contrary are quite simply incomprehensible.

Lastly, the defense points to comments allegedly made by Mr. Neely to a private investigator hired by the Defendants.[25] Mr. Neely indicated that he had told the FBI that "the fact that audit documents were not obtained did not mean 'a fraud was going on.'" Sarno Appendix (Case No. 95–50270), Tab 326, ex. H.[26] While this observation is certainly true, we cannot see how it exculpates any of the Defendants. Mr. Neely, far from attacking the ample evidence of the audit's misrepresentations, does not even state that a fraud was *not* perpetrated. The statement is, at best, equivocal.

▅ Weighed as a whole, the evidence characterized as *Brady* material by the Defendants—all of which is marginal, ambiguous, cumulative, inadmissible, unreliable, inculpatory, irrelevant, or of negligible probative worth—falls far short of undermining our confidence in the verdicts. The Defendants—or their counsels—seem unable after years of legal battles to grasp the essence of the Government's case against them. This trial did not revolve around the arcane subtleties of modern finance; rather, the Government alleged, and proved, that the Defendants knowingly submitted documents to Western that contained blatant misrepresentations and falsehoods. The *Brady* evidence—if such it were—tugs at loose threads hanging from the margins of the Government's case, but

---

**25.** These comments are memorialized in the investigator's account of the interview.

**26.** The Defendants assert that the declaration contains other exculpatory comments. Our review of those comments suggests that such a conclusion is arguable. The district court, in any event, found that the declaration does not indicate whether the additional comments were relayed to the Government. We agree. They cannot therefore constitute *Brady* material.

in no way challenges the bulk of the evidence upon which the convictions rest. We therefore hold that the cumulative impact of the alleged *Brady* violations does not suffice to support a finding of "materiality" within the meaning of *Bagley* and *Kyles*.[27]

### B. Newly Discovered Evidence

We review for abuse of discretion the denial of a motion for new trial based upon newly discovered evidence. *See United States v. Sitton*, 968 F.2d 947, 958–59 (9th Cir.1992), *cert. denied*, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993). To obtain a new trial, the Defendants must show that

(1) the evidence is newly discovered; (2) the failure to discover the evidence sooner was not the result of lack of diligence; (3) the evidence is material to the issues at trial; (4) the evidence is neither cumulative nor impeaching; and (5) the evidence indicates that a new trial would probably result in acquittal.

*Id.* at 959–60. We affirm the decision of the district court.

The Defendants point to four pieces of evidence that they assert would have changed the outcome of the trial: a disclosure made by the Government in an unrelated case that accuses Mr. Driggs of various forms of fiscal wrongdoing; a series of letters written in July 1988 that arguably indicate that certain of the stock swaps had not been rejected as of that time; a declaration made by Mr. Allin Karls that allegedly impeaches two of the Government's minor witnesses; and, inexplicably, a portion of the Government's brief on appeal. Even assuming that all four of these items somehow qualified as noncumulative, non-impeaching newly discovered evidence, we are unconvinced that their introduction at trial would have had any effect upon the outcome. We note, moreover, that the Defendants have made no credible showing of diligence. Last-

ly, and most significantly, the Defendants on appeal have adduced no evidence that could possibly lead us to conclude that the district court's decision constituted an abuse of discretion.

### C. Witness Intimidation

The Defendants contend that the Government intimidated two witnesses, Mr. Rene Morentin and Mr. Thomas Neely, who could have potentially aided the defense. The Defendants' assertions are meritless. While it might be said that the prosecutors were somewhat aggressive in the interviews held with these gentlemen, they did not approach the line of misconduct. *Cf. United States v. Kojayan*, 8 F.3d 1315 (9th Cir.1993). It is, moreover, far from clear that the testimony of Mr. Morentin or of Mr. Neely would have benefitted the Defendants.

### XV. Conclusion

We reverse the two-level upward departure imposed on the Defendants for jeopardizing the safety and security of a financial institution, and remand to the district court for resentencing in accordance with this opinion. We reverse Mr. Nash's sentence, and remand for further proceedings consistent with this opinion. We affirm the district court with respect to all other issues raised by the Defendants.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

**27.** We note that all of these witnesses, and their respective roles in the relevant events, were well-known to the Defendants. We question therefore whether the evidence drawn from their statements was in fact suppressed by the Government so as to be unknown to the Defendants. *See United States v. Dupuy*, 760 F.2d 1492, 1501–02 & n. 5 (9th Cir.1985); *see also United States v. Marashi*, 913 F.2d 724, 733–34 (9th Cir.1990).